UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VONDA NOEL, On behalf of HERSELF and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:11-cv-519 |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, | ) ) ) ) | Judge Sharp |
| Defendant. | ) ) | |

## MEMORANDUM

Pending before the Court are two motions for summary judgment. First is Plaintiff Vonda Noel's motion concerning the certified class's breach-of-contract claim. (Docket Nos. 201, 203, 230, 236). Next is Defendant Metropolitan Government of Nashville and Davidson County, Tennessee's motion on the certified class's breach-of-contract claim, as well as its unjust-enrichment claim. (Docket Nos. 213, 218, 223, 237). For the reasons stated, the Court will DENY Plaintiff's motion with respect to the breach-of-contract claim. The Court will GRANT Defendant's summary-judgment motion on the breach-of-contract claim but will DENY that motion on the unjust-enrichment claim.

## BACKGROUND

This is a pay dispute over the proper way to read the set of documents that govern the compensation of Correctional Officers (COs) who work for the Davidson County Sheriff's

1

Office (DCSO). Instead of setting out the facts in their entirety at the outset, the court will review only those details necessary to provide context and reserve others for later discussion.

The Metropolitan Nashville/Davidson County Charter requires that compensation schedules for these civil-service employees be set out in a comprehensive Pay Plan. Once approved by the Mayor, the Metro Council reviews and adopts the Pay Plan by resolution. Each annual Pay Plan covering the relevant time period of this lawsuit includes four parts: (1) a comprehensive list of Metro job titles; (2) pay tables for each job title that state compensation for each job title, mostly denominated in hourly, semi-monthly, bi-weekly, and annual increments; (3) an "Explanation of Pay Types" page that describes the nature of the jobs listed in each pay table; and (4) an "Explanation of Pay Calculations" page that explains pay-table calculations. (Docket No. 226 at 2–3). So, for example, the Pay Plan for fiscal year 2013 shows that an entry-level "Correctional Officer 1" at the first step of the pay scale earns $15.17 hourly, $1315.12 semi-monthly (i.e., twice a month), $1213.96 bi-weekly (i.e., every two weeks), and $31,562.96 annually. Once promoted to the next step of the pay scale, that CO would earn $15.68 hourly, $1358.98 semi-monthly, $1254.44 bi-weekly, and $32,615.44 annually.

As might be guessed, the four increments found in the Pay Plan's pay table are related to one another. Taking the annual rate as the starting point, the bi-weekly rate is the annual rate divided by 26 (as there are 26 bi-weekly periods in a year), the semi-monthly rate is the annual rate divided by 24 (as there are 24 semi-monthly periods in a year), and the hourly rate is the annual rate divided by 2080 (as there are 40 hours in a week and 52 weeks in a year).[1]

---

[1] Readers who crunch the numbers will see the figures are slightly off. This is due to rounding errors, as the hourly rates expressed in the Pay Plan contain two decimal points but are derived from more specific rates that contain three decimal points. COs' paystubs reflect these more specific rates.

When a CO receives his paycheck, his paystub indicates an hourly rate that is the same as the hourly rate in the Pay Plan (apart from the different number of decimal places). And when a CO works overtime hours beyond his regularly schedule shifts, his overtime rate is based on the hourly rate in the Pay Plan. The trouble, though—at least as far as Noel is concerned—is that the hourly rates Metro pay COs are lower than the hourly rates stated in the Pay Plan or on their paystubs. The reason is simple enough: while the Pay Plan assumes an employee works 40 hours a week, COs are regularly scheduled to work more than that—either 168 hours (fourteen 12-hour shifts) or 170 hours (twenty 8.5-hour shifts) in a 28-day period.[2] That amounts to either 42 or 42.5 hours a week, not 40 hours. So when the annual rate in the Pay Plan is translated to reflect that changed assumption (i.e., when the annual rate is divided by 2184 or 2210 hours), a lower hourly rate results.

Metro doesn't think this is a problem because, it insists, a CO is a salaried employee entitled only to the Pay Plan's annual rate. Since a CO will earn that annual amount if he works all of his regularly scheduled hours over the course of a year, Metro says that its practices comport with the terms of the Pay Plan. The rub, though, is that a CO will only earn the Pay Plan's stated annual amount if he works no more and no less than his regularly scheduled hours. If he works more hours, he will be paid overtime, which means that his annual compensation will exceed the Pay Plan's annual rate. And if he works fewer hours—because, say, he misses six

---

[2] This is consistent with the Fair Labor Standard Act (FLSA), which requires employers to pay most employees an overtime rate for any hours worked in excess of 40 per week. *See* 29 U.S.C. § 207(a)(1). Section 7(k) of the FLSA, however, enables public entities that employ law-enforcement personnel to define a longer "work period" that may range from 7 to 28 days. *Id*. § 207(k). Depending on the range chosen, Department of Labor regulations fix the maximum-hours standard. For a 28-day period, for example—which is the work period Metro uses for COs—overtime must be paid when law-enforcement personnel work more than 171 hours. 29 C.F.R. § 553.230(c) (table).

hours of work for personal reasons one day—his pay will be docked to account for that shortfall; at the end of the year, he will end up earning less than the Pay Plan's annual rate.

Noel's claim relevant to both summary-judgment motions under consideration is that Metro's practice of paying COs at lower hourly rates than those prescribed in the Pay Plan from July 18, 2006, breached its contractual obligations to class members. Noel urges in the alternative that even if Metro did not have a *contractual* obligation to pay them the higher hourly rate in the Pay Plan during this time, Metro is still liable to the COs because it was unjustly enriched by pocketing the difference. Both parties seek summary judgment on the contract claim. Only Metro moves for judgment on the unjust-enrichment claim.

## **LEGAL STANDARD**

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question is whether any genuine issue of material fact is in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial. If the party does not do so, summary judgment may be entered. Fed. R. Civ. P. 56(e). The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the

moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When ruling on cross motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## ANALYSIS

*Breach-of-contract claim*

The core of Noel's breach-of-contract claim is that Metro's practice of paying COs at hourly rates that are lower than those set forth in the Pay Plan breaches their employment contracts because Metro is bound to compensate COs at the Pay Plan's higher rate. Metro contends that Noel's claim does not properly sound in contract because it flows from an alleged violation of a legislative enactment. To this, Noel offers that "[a] basic tenet of Tennessee law is that *any* 'employment relationship is essentially contractual.'" (Docket No. 203 at 24 (quoting *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 491 (Tenn. Ct. App. 2003))). And she cites cases that purportedly stand for the proposition that "local governments, acting as employers, are contractually bound to follow their own laws and regulations." (*Id*. at 24–25 (citing *Goot, et al. v. Metro. Gov't of Nashville of Davidson Cnty.*, 2005 WL 3031638, at *6 (Tenn. Ct. App. Nov. 9, 2005))).

What Noel glosses over, however, is the "general rule" that, "absent some clear indication by a legislative body that it intends to bind itself contractually, there is a presumption [that] a law is not intended to create private contractual or vested property rights, but rather the

5

law merely declares a policy to be pursued until a legislative body ordains otherwise," *Stohler v. Menke*, 998 F. Supp. 836, 839 (E.D. Tenn. 1997) (citing *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66 (1985) and *Dodge v. Bd. of Educ. of City of Chi.*, 302 U.S. 74, 79 (1937)). In *Dodge*—a case on which Tennessee courts continue to rely, *see, e.g.*, *Ussery v. City of Columbia*, 316 S.W.3d 570, 581–82 (Tenn. Ct. App. 2009)—the Supreme Court articulated the circumstances in which a statute may create private contractual obligations:

> In determining whether a law tenders a contract to a citizen, it is of first importance to examine the language of the statute. If it provides for the execution of a written contract on behalf of the state, the case for an obligation binding upon the state is clear. Equally clear is the case where a statute confirms a settlement of disputed rights and defines its terms. On the other hand, an act merely fixing salaries of officers creates no contract in their favor, and the compensation named may be altered at the will of the Legislature. This is true also of an act fixing the term or tenure of a public officer or an employee of a state agency. The presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise. He who asserts the creation of a contract with the state in such a case has the burden of overcoming the presumption. If, upon a construction of the statute, it is found that the payments are gratuities, involving no agreement of the parties, the grant of them creates no vested right.

302 U.S. at 78–79. For the class's contract claim to succeed, Noel must show that the Pay Plan, which is the legislative enactment on which they assert a contractual right, creates a contractually binding obligation on Metro to pay COs the Pay Plan's hourly rate.

Noel cannot do so because the Pay Plan, just as *Dodge* describes, is "an act merely fixing salaries of officers" that "may be altered at the will of the Legislature"; such legislation "creates no contract in [the COs'] favor." *Id.* at 78. Noel does not argue that the Pay Plan is somehow distinguishable. Nor does she cite authority suggesting the Pay Plan "provides for the execution of a written contract on behalf of the state," "confirms a settlement of disputed rights and defines

6

its terms," or even "involv[es] [an] agreement of the parties." As a result, Noel's inability to demonstrate that the Pay Plan creates a contractual obligation is fatal to the class's contract claim, which requires, among other elements, the existence of an enforceable contract. *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007). Absent that, the contract claim fails as a matter of law, entitling Metro to summary judgment on it.

*Unjust-enrichment claim*

Metro alone seeks summary judgment on Noel's alternatively pleaded unjust-enrichment claim. (Docket No. 218 at 1–2). The theory of unjust enrichment is "founded on the principle that a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). A claim of unjust enrichment in Tennessee includes three elements. *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc.*, 407 S.W.2d at 155). In the posture of this case,

> [i]n order to withstand a motion for summary judgment . . . there must be genuine issues of material fact as to whether 1) the plaintiff conferred a benefit on the defendant; 2) the defendant appreciated the benefit; and 3) whether it would be inequitable for the defendant to retain the benefit without paying for it.

*Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*, 21 F. Supp. 2d 785, 805 (W.D. Tenn. 1998) (quoting *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995)) (alterations and internal quotation marks omitted); *see also Freeman Indus., LLC*, 172 S.W.3d at 525. "A benefit is any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." *Id*. "The most significant requirement . . . is that the benefit to the defendant be unjust." *Id*. Claims of unjust enrichment may lie against

municipal entities, just as they can against private parties. *City of Lebanon v. Baird*, 756 S.W.2d 236, 245 (Tenn. 1988).

Noel's claim is that although COs conferred a benefit on Metro that Metro appreciated—in the form of their work—Metro's retention of that benefit is inequitable insofar as COs are compensated at hourly rates lower than those stated in the Pay Plan. (Docket No. 223 at 19). Metro sees it differently and makes two principal arguments. First, Metro maintains that Noel cannot show COs conferred a benefit on Metro for which Metro didn't compensate them because the Pay Plan establishes that COs are salaried workers entitled only to the Pay Plan's annual rate, not its higher hourly rate. Second, Metro says, even if a fact question remains as to whether COs are salaried or hourly employees, paying COs the lower hourly rate is not unjust because they acquiesced to the practice. (Docket No. 218 at 30).

In support of its first argument, Metro primarily relies on a graphical interpretation of the Pay Plan[3] and its actual pay practices to press its point that COs are salaried. Metro says the pay table that is part of each relevant Pay Plan explicitly distinguishes between classifications for which annual salary serves as the base rate versus those for which hourly pay serves as the base rate. This distinction is found in the graphical placement of the line on which the job type/grade appears on the pay table. For hourly positions, the job type/grade appears on the pay scale's hourly line. And for salaried positions, it appears on the annual line. So, for example, the classification label for Trades and Labor positions—which the "Explanation of Pay Calculations" says are "based on an hourly rate," (*see, e.g.*, Docket No 215-6 at 3)—appears on the hourly line of the pay table; by contrast, the classification label for Standard Range and

---

[3] This discussion assumes familiarity with the component parts of Metro's Pay Plan, described at the outset.

Public Safety positions—which the "Explanation of Pay Calculations" states are "based on an annual salary," (*see, e.g.*, *id.*)—is located on the pay table's annual row.  Because the classification labels for the relevant CO job types/grades are located on annual rows, Metro concludes, COs are salaried employees entitled to the annual rate.

While Metro's graphical reading is reasonable, so is a contrary understanding.  A factfinder could just as well conclude that a binding pay document that expressly lists hourly rates entitles employees to earn those hourly rates.  Moreover, other parts of the Pay Plan further undermine Metro's assertion of a clear-cut classification.  The "Explanation of Pay Calculations" for the time periods in question, for example, does not say that CO pay tables are based on an annual salary.

The two changes Metro made to the 2014 Pay Plan's "Explanation of Pay Calculations"—done, Metro says, to "simply clarify[] the existing practice of paying [COs] on an annual-salaried basis," (Docket No. 218 at 24)—only underscore the lack of clarity.  Specifically, the 2014 Pay Plan's after-the-fact clarifications—stating that CO pay scales "are based on an annual salary," and that "employees in classifications that work more hours for their salary (e.g., those in the PS and CO scales), the hourly rate shown is not reflective of the actual hourly rate received," (*id.* at 7–8)—do not address the fact that class members allege they relied on prior Pay Plans that lacked these disclaimers before concluding they were entitled to the Pay Plan's hourly wage rates.  And even if that were not so, the Metro Council resolution adopting the 2014 changes is limited on its face to correcting an "inadvertently omitted reference" in the CO pay table that "became effective on July 1, 2013."  (Docket No. 216-9 at at 1).  Whatever the

scope of the recent changes, they do not "clarify" the same "inadvertently omitted" references in Pay Plans operative throughout the period of Noel's claims, which stretch back to July 2006.[4]

Metro also says its actual payment practices resolve that COs are salaried employees who deserve only the Pay Plan's annual rate. Metro points out that CO pay does not change from week to week or cycle to cycle, as a CO is paid the same biweekly salary every two weeks listed in the Pay Plan, which is itself derived from the annual salary in that document. The result, Metro says, is that COs are salaried employees entitled to a fixed salary, not a fixed hourly wage.

Metro's actual pay practices could reasonably lead employees to conclude they are hourly employees. To take one example, a factfinder could conclude that Metro's practice of docking the pay of COs who miss less than a full day of work shows that Metro treats COs as hourly employees. The docking practice works like this: if, for example, a CO with no banked leave time leaves work 6 hours early for personal reasons and, as a result, works 6 fewer hours than he is regularly scheduled for during a 28-day pay period, his pay will be reduced by the equivalent of 6 hours to account for that deficit. Such docking may reasonably indicate that Metro ties CO compensation to the quantity of work COs perform, which undermines the conclusion that they receive a fixed salary.

So, too, could a factfinder conclude that COs justifiably understood that they earn the hourly rate in the Pay Plan because the pay statements Metro issues to COs reflects that same hourly rate. It is far from unreasonable for a CO to think he is paid the amount his paycheck says he is paid. Indeed, several COs stated in depositions that their paychecks were the basis of

---

[4] The Court notes that Noel appears to concede that the changes Metro made to the 2014 Pay Plan have solved the problem on which Noel premises her claim, at least on a go-forward basis. (*See* Docket No. 203 at 37 (stating that "Metro could have designated the annual rate as controlling, but chose not do so until July 2013")).

10
Case 3:11-cv-00519 Document 245 Filed 01/28/14 Page 10 of 13 PageID #: 5170

their belief that they are hourly employees.[5]  On top of that, the deposition testimony of top-ranking Metro officials consistent with the conclusion that COs are hourly employees underscores the existence of an issue of fact that a jury must take up.[6]  At bottom, the combination of Metro's indeterminate Pay Plan documents and its pay practices creates a factual question as to whether COs reasonably believed they are hourly employees entitled to compensation equal to the hourly rate set in the Pay Plan.  From that starting point, a jury will consider whether COs conferred a benefit on Metro that Metro enjoyed but didn't appropriately compensate COs for, and whether injustice results if Metro retains the value of that benefit.

The second argument Metro levels against Noel's unjust-enrichment claim is that COs acquiesced to Metro's practice of not paying the Pay Plan hourly rate. (Docket No. 218 at 31–34).  COs should have known after receiving their first paycheck that they were not earning the higher hourly rate, Metro says.  Coupled with the fact that COs didn't address their concerns

---

[5] For example, when Metro asked LeRonce Mitchell if he knew how much money he made a year, he answered that his hourly wage is $17.20, a rate he is paid according to the Pay Plan.  When pressed again to say what he makes annually, Mitchell answered, "I know that I make about 17.20 an hour.  I don't know what that equates to . . . [b]ut I know that when I look at my pay stub, there was an hourly figure on there and it was like 17.19, 17.20, something along there."  (Docket No. 224-10 at 2).  Asked the same question, Xaviere Cunningham said the same thing: "I don't know the annually [sic] amount.  I just know the hourly amount."  (Docket No. 224-11 at 2).  And when asked how she knew the hourly amount, Cunningham responded, "That's what it said on my paycheck."  (*Id*.).  Other COs said the same thing.  (*See, e.g.*, Docket No 224-16 at 2 (asked if she understood that she was an hourly or salaried worker based on her paycheck, Tanya Lawrence answered, "Hourly."); Docket No. 224-18 at 2 (asked whether he now believes he is a salaried employee, Willie Lee Anderson, Jr. responded, "I didn't believe that I was salaried the very first time I saw my paycheck, with the breakdown of hours."); Docket No. 224-19 at 2 (responding to the question of how he knew his hourly rate, Adam Boyd said, "Actually, it's on your pay stub."); Docket No. 224-20 at 2 (asked how she knows how much she makes a year, Vonda Noel responded, "My paycheck stubs tell me how much I make hourly and I just calculate it.")).

[6] For example, when asked whether COs are salaried or hourly employees, Davidson County Sheriff Daron Hall testified that "[t]echnically, they are hourly . . . by the Metro Government's computation . . . or interpretation."  (Docket No. 205-5 at 8).  Asked the same question, Metro's designated representative on the Pay Plan, Michael Taylor, said that COs are "hourly employees."  (Docket No. 224-1 at 2).

11

with Metro, Metro reckons that retaining the difference between the hourly rates it paid COs and the hourly rates it published in the Pay Plan is not unjust.

This argument in analogous to one rejected in *Carter v. Jackson-Madison Cnty. Hosp. Dist.*, 2011 WL 1256625, at *8–9 (W.D. Tenn. Mar. 31, 2011). In that case, hospital employees alleged their employer failed to properly compensate them for work performed during meal breaks. The hospital relied on *Lakeside Realtors, Inc. v. Ross*, 1990 WL 17212, at *3 (Tenn. Ct. App. Feb. 28, 1990), to support its claim that Tennessee law barred an unjust-enrichment claim if the plaintiff "undertook the risk" that she would not be compensated for her work. *Carter* pointed out that avoidance of risk is not an element of an unjust-enrichment claim as to which there must be a genuine issue of material fact to survive summary judgment. 2011 WL 1256625, at *9. The Court agrees. Whether COs were dilatory in raising their concerns will be one of several factors a jury will consider in determining whether it is unjust to permit Metro to retain the difference between the higher and lower hourly rates.

To summarize: Neither Metro's Pay Plan nor its pay practices conclusively establish that COs are salaried workers entitled only to the annual compensation stated in the Pay Plan. Viewing the evidence, a reasonable jury could determine COs properly understood upon hiring that they would earn the Pay Plan's stated hourly rate. As a result, a jury will have to determine whether COs conferred a benefit on Metro for which Metro did not appropriately compensate them, and if so, whether COs can recover the value of that benefit in the interests of justice.

The Court will deny Metro summary judgment on Noel's unjust-enrichment claim.

## CONCLUSION

For the reasons stated, the Court will DENY Plaintiff's motion for summary judgment on the class's breach-of-contract claim. (Docket No. 201). The Court will GRANT Defendant's summary-judgment motion on the class's breach-of-contract claim but will DENY it on the class's unjust-enrichment claim. (Docket No. 213). An appropriate order will be entered.

*Kevin H. Sharp*

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE