# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **VONDA NOEL, on behalf of herself** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:11-cv-519** |
| **v.** | ) | **Judge Sharp** |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the Court is Defendant Metropolitan Government of Nashville and Davidson County's Motion to Decertify Collective Action (Docket No. 145), to which Plaintiff has responded (Docket No. 154), Defendant has replied (Docket No. 160), and Plaintiff has filed a sur-reply (Docket No. 169). The matter has been thoroughly briefed by the Parties, and the relevant facts are set forth to the extent needed to address the decertification issue. For the reasons stated below, Defendant's Motion will be denied.

## I.      Statement of the Facts

Plaintiff Vonda Noel is a resident of Tennessee who has been continuously employed by Defendant since 2004. She brings this collective action on behalf of herself and 235 fellow corrections officers ("COs") stationed at five detention facilities in Davidson County. Plaintiff claims Defendant's pay policy for shift time rather than time worked, paired with institutional procedures that resulted in COs routinely working overtime, resulted in violations of the overtime pay provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. The FLSA

1

class is comprised of "[a]ll Correctional Officers who are or were employed by the Metropolitan Government of Nashville and Davidson County, Tennessee and/or the Davidson County Sheriff's Office since June 2, 2008." (Docket No. 172 at 14). Class members are "non-management, uniformed officers" holding the position rankings of Corrections Officer 1 ("CO 1"), Corrections Officer 2 ("CO 2"), and Corrections Officer 3 ("CO 3").

Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") is a government entity operating pursuant to Tennessee law. Davidson County Sheriff's Office ("DCSO") is a department within Metro. Defendant operates detention facilities in Davidson County including the Correctional Development Center – Male, the Correctional Development Center – Female, the Criminal Justice Center, the Hill Detention Center, and the Offender Re-Entry Center. The Armed Services Division of DCSO oversees transportation of inmates housed in these facilities.[1]

Plaintiff began working for Defendant in 2004 at the Correctional Development Center – Male in 2004. In 2006, she moved to the Criminal Justice Center where she remains employed as a CO 2. She claims "Defendant has routinely required her to work additional time after the end of her paid shift without providing her with any corresponding additional compensation." (Docket No. 172 at 13).

At issue in the Motion currently pending is Defendant's contention that members of the FLSA class are not in fact similarly situated – neither to each other nor Named Plaintiff Noel.

---

[1] Plaintiff's "Response in Opposition to Defendant's Motion to Decertify Collective Action" confirms that COs who work exclusively within the Armed Services Division are not included within the scope of the FLSA collective action and, to the extent that Defendant can identify opt-in Plaintiffs who have work exclusively in the Armed Services Division since June 8, 2008, Plaintiffs do not object to their dismissal. Plaintiff maintains that COs employed exclusively in the Armed Services Division are proper class members in the pending class action brought pursuant to Federal Rule of Civil Procedure 23(b)(3). (Docket No. 154 at 3 n.2).

2

Generally, Defendant points to, *inter alia*, "differences in outcomes and practices between five separate correctional facilities, differences in outcomes among the two or three shifts in each correctional facility, [and] differences in outcomes and practices among individual supervisors" as indications the action should be decertified. (Docket No. 146 at 2).

As for differences in shifts at each facility, further background is required. Originally, all five of the facilities were staffed by three rotating 8.5-hour shifts. Each corrections officer worked approximately 20 shifts per 28-day pay period. In spring 2009, Hill Detention Center switched to two 12-hour shifts. Correctional Detention Center – Male and Correctional Detention Center – Female followed suit in fall 2012. The remaining facilities operate under the original shift schedule. Both of the facilities where Plaintiff worked use the 8.5-hour shift structure. The Motion to Decertify notes that nine of the twelve opt-in plaintiffs deposed in discovery have worked or currently work at 12-hour shift facilities.

On the 8.5-hour shift schedule, COs at the Criminal Justice Center and Offender Re-Entry Center work a total of 170 hours in a 28-day pay period. Shift changes are scheduled with a half-hour overlap time where all inmates are accounted for, a process called "clearing count." (Docket No. 172 at 15). Count must clear for the entire facility, or for each unit in the facility, before corrections officers in the entire facility, or for each unit of the facility, may depart at the conclusion of their shift. Defendant confirms that "most of the time" count must clear for the entire facility, or for each unit, before corrections officers ending their shift may depart individually as well. (Docket No. 178 at 8-9). Plaintiff asserts that count often clears after the end of a scheduled shift, requiring officers to routinely work late without compensation.

As previously stated, Hill Detention Center and the Male and Female Correctional

3

Detention Centers are organized on a 12-hour shift schedule, with two shifts each day that do not overlap. Officers work 168 hours in a 28-day pay period. Without an overlap period, count must clear before the end of a shift, therefore this task is assigned to a rover or lieutenant rather than the COs. However, though count clear does not postpone their departure, COs at these facilities are likewise delayed "at least a few minutes on *every* shift" as the incoming shift completes pre-shift roll call duties.[2]  (Docket No. 154 at 8) (emphasis in original).

Plaintiff does not allege "Metro *never* pays correctional officers for their post-shift work."  (Id.) (emphasis in original). COs that work double shifts, for example are compensated with overtime, comp time, or flex time. However, "this policy only compensates correctional officers who, on rare occasions, work *significantly* beyond the end of their scheduled shifts. For shorter amounts of post-shift work, which occur on a regular basis, Metro's policy is to provide no compensation at all."  (Id. at 9) (emphasis in original). Because the routine delays at all five facilities generally conclude within thirty minutes of shift end, no pay exception is entered into the payroll system to extend the recorded time worked for each CO.

Plaintiff asserts that the differences highlighted in the Motion to Decertify are irrelevant for collective action purposes, because Defendant maintains a common policy under which all Plaintiffs are required to "perform post-shift work for which they receive no compensation." (Docket No. 154 at 2). Thus, "Metro's 'shift-time' policy binds all class members together and makes this collective action appropriate."  (Id.).

---

[2]  Plaintiff asserts that in August or September 2012, after the filing of this lawsuit, pre-shift roll call was abolished. (Docket No. 154 at 8).

4

## II.    Legal Analysis

Section 207(a) of the FLSA generally requires that employers pay employees specified hourly rates for up to forty hours per week and pay overtime compensation of one and one-half times the regular rate for hours worked in excess of forty hours.    29 U.S.C. § 207. Enforcement of this provision is authorized through collective actions brought by an employee on his own behalf and all those who are "similarly situated" and who "opt-in" by giving consent in writing to become a party.    29 U.S.C. § 216(b).

For the purposes of a collective action, all employees must be "similarly situated."    This determination is generally made in a two-stage process.    The first stage occurs early in the litigation, typically before the commencement of formal discovery, and applies a "'fairly lenient standard'" to determine "whether plaintiffs are similarly situated" such that a class should be conditionally certified.    White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 877 (6th Cir. 2012).    At the second stage, after completion of discovery, "courts apply a 'stricter standard' and more closely examine 'the question of whether particular members of the class are, in fact, similarly situated.'"    Id. at 878.    Thus, while the "fairly lenient standard" often leads to conditional class certification, it is "'by no means final.'"    Comer v. Wal–Mart Stores, Inc., 454 F.3d 544, 546-47 (6th Cir. 2006) (citation omitted).

Lead plaintiffs bear the burden of showing that opt-in plaintiffs are substantially similar. Frye v. Baptist Memorial Hospital, Inc., 495 Fed. Appx. 669, 672 (6th Cir. 2012).    FLSA provides no definition of "substantial similarity."    However, the Sixth Circuit has "tacitly approved," id., three factors to aid the Court's determination of whether certification is appropriate in this case: (1) "'the factual and employment settings of the individual plaintiffs'";

5

(2) "'the different defenses to which the plaintiffs may be subject on an individual basis'"; and (3) "'the degree of fairness and procedural impact of certifying the action as a collective action.'" O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 584 (6th Cir. 2009).

The Sixth Circuit did "not purport to create comprehensive criteria for informing the similarly-situated analysis," but it did make several salient observations that guide this Court's consideration. Id. at 585. "Showing a 'unified' policy is not required," and, unlike a class action brought under Federal Rule of Civil Procedure 23(b), the predominance of individualized issues is not fatal to a collective action. Id. at 584. However, "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all plaintiffs." Id. at 585. Plaintiffs can also be similarly situated where "their claims [a]re unified by common theories of statutory violations, even if the proofs of these theories are inevitably individualized and distinct." Id.

### A. Factual and Employment Settings of Individual Plaintiffs

Defendant's Motion to Decertify sets forth in great detail differences between and among class members who work on each shift schedule. Most importantly, "because count clear is not what determines the end of the workday at a 12-hour-shift facility, Plaintiffs working in 8.5-hour-shift facilities are not similarly-situated to those working in 12-hour-shift facilities." (Docket No. 146 at 21). Even within the facilities on 8.5-hour shifts, each has individual count clear times for every shift, which, Defendant asserts, must be analyzed on a day-by-day, shift-by-shift basis in order to determine the existence of an FLSA violation. Similar variances among 12-hour shift facilities also exists – the depositions of opt-in plaintiffs reveal class

6

members may have had many reasons for staying on after their shift time.

To this end, Defendant asserts that <u>Seward v. IBM Corp.</u> is instructive. 2012 WL 860363 (S.D.N.Y. March 9, 2012) (adopting the magistrate judge's report and recommendation). There, an IBM call center representative brought a collective action against his employer, claiming he was required to perform uncompensated work in the time before his shift began. <u>Id.</u> at *2. Specifically, IBM required that he be "call ready" at the beginning of his shift by booting up his computer beforehand. The class was comprised of thirty-nine opt-in plaintiffs. However, only about half of them worked in similar positions to plaintiff, in that the majority of their work involved fielding calls and they were required to power on their computers prior to the start of their shift. As noted by the magistrate judge, the other half worked under managers who did not require they be "call ready" pre-shift at all. Given this significant difference, the magistrate judge found – and the court agreed – that the named plaintiff was not similarly situated to all opt-in plaintiffs on the whole, and decertified the action.

This case is distinguishable from the matter currently before the Court. A material factor at this stage of the analysis is whether all members of the class were "impacted by a 'single decision, policy, or plan.'" <u>Wilks v. The Pep Boys</u>, 2006 WL 2821700 at *3 (M.D. Tenn. Sept. 26, 2006) (citing <u>Moss v. Crawford & Co.</u>, 201 F.R.D. 398, 409-10 (W.D. Pa. 2000)). "The existence of this commonality may assuage concerns about plaintiffs' otherwise varied circumstances." <u>Id</u>.

In <u>Seward</u>, half of the plaintiff class did not share the named plaintiff's essential grievance – the requirement that they perform uncompensated work tasks before the start of their shift. In the current case, members of the FLSA class are routinely required to work beyond the

7

end of their shifts under a pay structure that does not compensate them for overtime lasting less than half an hour. Though the reason for the delay varies between the 8.5 and 12-hour shift facilities, Plaintiff has offered significant evidence to support its contention that, "Metro (1) paid *all* correctional officers based on shift time, rather than time actually worked; (2) regularly required entire shifts of correctional officers to stay past the end of their scheduled shifts; and (3) failed to compensate the class members for this post-shift time." (Docket No. 154 at 3) (emphasis in original).

"Notably, even at the decertification stage, *similarly* situated does not mean *identically* situated." Wilks, 2006 WL 2821700 at *3 (emphasis in original). Parties would be hard pressed to identify an example in which employees participating in a collective action were subjected to identical circumstances. Indeed, "[i]f one zooms in close enough on anything, differences will abound." Frank v. Gold'n Plump Poultry, Inc., 2007 WL 2780504 at *4 (D. Minn. Sept. 24, 2007). The Court is satisfied Plaintiff has met her burden at this stage in the proceedings to show the presence of a common issue. See Houston v. URS Corp., 591 F. Supp. 2d 827, 832 (E.D. Va. 2008) ("That is not to say that there can be no differences among class members or that an individualized inquiry may not be necessary in connection with fashioning the specific relief or damages to be awarded to each class member. Rather, the inquiry is whether the presence of common issues allows the class-wide claims to be addressed without becoming bogged down by individual differences among class members."). Therefore, this factor weighs against decertification.

**B. Available Defenses**

Before the Court considers the second factor, some background is required. FLSA

8

requires most employers to pay employees at an overtime rate for any hours worked in excess of 40 hours per week.   SEE 29 U.S.C. § 207(a)(1).   However, § 207(k) enables public entities that employ law enforcement personnel to define a longer work period, ranging from 7 to 28 days. Id. § 207(k).   The Department of Labor is charged with setting a maximum-hours standard depending on the work period range.   For example, in a 28-day work period, which Metro uses, law enforcement officers may work a maximum of 171 hours before receiving overtime.   SEE 29 C.F.R. § 553.230(c).

Defendant contends that the defenses applicable to COs change depending on what shift schedule they work.   Those who work 8.5-hour shifts are scheduled for 170 hours per pay period, thus "Metro is not violating the FLSA until those officers stay more than one hour past their scheduled shift."   (Docket No. 146 at 32).   However, because COs who work 12-hour shifts are scheduled for 168 hours per pay period, "those officers have to work three hours over the scheduled shift before Metro violates the FLSA."   (Id.).

As the Court understands it, this argument seems to skip a step.   While Metro may owe COs overtime after the 171-hour mark, it does not necessarily follow that § 207(k) allows employers to withhold compensation for time worked outside of a scheduled shift but of shorter duration than qualifies for overtime pay, so-called "straight time" or "gap time."   See Lamon v. City of Shawnee, Kan., 972 F.2d 1145, 1159 n.20 (10th Cir. 1992) ("The establishment of a § 207(k) regime does not mean the City does not have to compensate an employee for additional time worked" even if overtime is not owed.).

Defendant protests that class members are salaried workers and that "the law permits a commonsense, neutral policy of paying salaried employees an unchanging amount of pay for

9

regularly-scheduled work." (Docket No. 160 at 6). However, the question of whether COs are salaried employees remains open. Defendant's characterization of COs' pay as an "unchanging amount" is rather misleading, given their paychecks are docked to account for work time missed, and overtime pay is added for extra shifts. As the Court noted in its Order denying Defendant's Motion for Summary Judgment,

> Neither Metro's Pay Plan nor its pay practices conclusively establish that COs are salaried workers entitled only to the annual compensation stated in the Pay Plan. Viewing the evidence, a reasonable jury could determine COs properly understood upon hiring that they would earn the Pay Plan's stated hourly rate. As a result, a jury will have to determine whether COs conferred a benefit on Metro for which Metro did not appropriately compensate them, and if so, whether COs can recover the value of that benefit in the interests of justice.

(Docket No. 245 at 12).

Additionally, Defendant contends that in order to determine when class members departed work will require a cumbersome day-by-day, shift-by-shift examination at each 8.5-hour shift facility, not to mention the individual examination of each class member's personal leave time to determine whether they have worked "off-the-clock." (Docket No. 146 at 34). Yet, the Court agrees with Plaintiff that determining count clear times is not as burdensome as Defendant fears. Metro records this information in a "Jail Management System." (Docket No. 154 at 18). The Court likewise agrees that Defendant's concern goes more to calculation of damages than defense to liability.

The Court concludes that, on balance, the defenses raised by Defendants are suitable for a collective forum. Defendant is free "to present evidence of its lawful employment policies and practices, to cross-examine individual representative plaintiffs, and to call to the stand others with material testimony" to aid its case. Wilks, 2006 WL 2821700 at *7. Moreover, as the case has already been bifurcated, the question of liability as it applies to the entire FLSA class

10

can be examined independent of subsequent inquiries regarding damages and the impact on individual plaintiffs.   See Espinoza v. 953 Assocs. LLC, 280 F.R.D. 113, 130 (S.D.N.Y. 2011) ("Although plaintiffs' claims may raise individualized questions regarding the number of hours worked and how much each employee was entitled to be paid, those differences go to the damages that each employee is owed, not to the common question of Defendant' liability."); see also Shahriar v. Smith & Wollensky Restaurant Group, Inc., 659 F.3d 234, 253 (2nd Cir. 2011) (citation omitted) ("'Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.'").

### C. Manageability, Fairness, and Due Process

Finally, the third factor requires the Court to consider "'the degree of fairness and procedural impact of certifying the action as a collective action.'"   O'Brien, 575 F.3d at 584. "Congress, in seeking to allow plaintiffs to vindicate their rights under the FLSA, provided them with the opportunity to do so collectively when appropriate." Wilks, 2006 WL 2821700 at *3 (citing 29 U.S.C. § 216(b)).

"A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources."   Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989).   Thus, Defendant's rights "must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court."   Wilks, 2006 WL 2821700 at *3.

Moreover, the Court concludes that a common thread unifies the claims of the FLSA class, rendering individual treatment largely duplicative when class-wide treatment offers a more efficient use of judicial resources.   "The judicial system benefits by efficient resolution in one

11

proceeding of common issues of law and fact arising from the same alleged discriminatory activity." Hoffmann-La Roche Inc., 493 U.S. at 170.  Therefore, the Court finds this factor too weighs against decertification.

### III.    Conclusion

Based on the foregoing, Defendant's Motion to Decertify Collective Action (Docket No. 145) will be denied.    An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

12